UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RONALD NAKHIL TORRES-FERNANDEZ,

Petitioner,

v.

MARKWAYNE MULLIN, *et al*.,

Respondents.

CASE NO. 2:26-cv-02795-GJL

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Ronald Nakhil Torres-Fernandez ("Petitioner") is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Dkt. 1. On August 6, 2026, Petitioner, through counsel, filed a Petition for writ of habeas corpus under 28 U.S.C. § 2241, seeking immediate release from immigration detention. *Id.* Respondents to the Petition include Markwayne Mullin (the Department of Homeland Security ("DHS") Secretary), David Venturella (Acting Director of ICE), Julio Hernandez (Field Office Director for ICE's Seattle Field Office), and Bruce Scott (Warden of the NWIPC) (collectively "Respondents"). The Petition has been fully briefed. Dkts. 1, 7, 11.

Having considered the Parties' submissions, the balance of the record, and the governing law, the Court **GRANTS** the Petition (Dkt. 1) and **ORDERS** Petitioner's release from immigration detention as set forth in the conclusion below.[1]

## I. FACTUAL BACKGROUND

The matter before the Court is a familiar one, and the operative facts are largely undisputed.[2] Petitioner is a native and citizen of Venezuela who sought admission to the United States at the Paso del Norte Port of Entry in Texas on June 23, 2023. Dkt. 1 at 2; Dkt. 1-3. Upon entry, immigration officials issued Petitioner a Notice to Appear identifying him as an applicant for admission and released him into the United States on humanitarian parole pending removal proceedings pursuant to 8 U.S.C. § 1182(d)(5). Dkts. 1-3; Dkt. 9-2. According to subsequently prepared DHS records filed by both Parties, Petitioner's humanitarian parole was set to expire on or about June 23, 2025. Dkt. 1-2; Dkt. 9-3.

More than three years after Petitioner was initially paroled into the United States—and more than one year after the stated expiration of his parole—immigration officials re-detained Petitioner on July 7, 2026, in Beaverton, Oregon, while he was working as a food-delivery contractor. Dkt. 1 at 2–3; Dkt. 9-3. Petitioner alleges that immigration officials informed him at the time of his apprehension only that he was being detained because his humanitarian parole

---

[1] The Parties have consented to proceed in this matter before a United States Magistrate Judge. Dkt. 5.

[2] Although not the direct subject of any factual dispute, the Court notes one material inconsistency in the DHS records submitted by the Parties. A Form I-213 prepared following Petitioner's re-detention reports that Petitioner did not request review of his custody determination by an immigration judge. Dkt. 1-2 at 4 (copy of I-213 submitted by Petitioner); Dkt. 9-3 at 3 (same document submitted by Respondents). The Notice of Custody Determination submitted by Respondents, however, is signed by Petitioner on July 7, 2026, and expressly reflects that he requested such review. Dkt. 9-5 at 2. Thus, the Court resolves this inconsistency by accepting the facts demonstrated by the documents served and signed by Petitioner at the time of his re-detention, rather than the summary of events subsequently recorded in the DHS I-213.

had expired. Dkt. 1 at 3. Petitioner further alleges that he was given no opportunity to contest the basis for his renewed detention before being returned to immigration custody. *Id.*

DHS records[3] submitted by the Parties indicate that, at some point around the time of Petitioner's re-detention, immigration officials assessed Petitioner as a flight risk based on the expiration of his parole, his alleged failure to report a change of address, and his movement through multiple states. Dkt. 1-2 at 4; Dkt. 9-3 at 3. On the day of his re-detention, immigration officials also provided Petitioner with a Notice of Custody Determination advising him of his right to request a custody review by an Immigration Judge ("IJ"). Dkt. 9-5 at 2. Petitioner requested such review. *Id.* There is no evidence or allegations a custody hearing has been provided, and Petitioner has remained detained at the NWIPC since July 7, 2026.

## II. PROCEDURAL BACKGROUND

Petitioner initiated this action on August 6, 2026, alleging that his re-detention was executed without the procedural protections guaranteed by the Due Process Clause of Fifth Amendment. Dkt. 1. Petitioner also submitted evidence in support of his Petition. Dkts. 1-2–1-4.

Respondents filed a Return on August 21, 2026, with supporting evidence. Dkt. 7; Dkt. 8; Dkts. 9, 9-1–9-5. Respondents contend that Petitioner, who entered the United States as an applicant for admission and was subsequently released on humanitarian parole, may not claim procedural protections beyond those provided by statute or regulation. Dkt. 7 at 8–9. Respondents further argue that, in any event, the process afforded to Petitioner was constitutionally sufficient. *Id*. at 6–10.

---

[3] Notably, the same Form I-213 containing the apparent error addressed in Footnote 2 above is the same DHS record reflecting an unspecified immigration official's purported assessment of Petitioner's flight risk.

Petitioner filed a timely Reply, arguing the constitutionally deficient process accompanying his re-detention is further demonstrated by Respondents' failure to comply with applicable regulations governing the termination of his humanitarian parole. Dkt. 11.

For the reasons discussed below, the Court agrees with Petitioner that he did not receive the constitutionally required process in connection with his re-detention. The Court therefore **GRANTS** the Petition (Dkt. 1) and **ORDERS** habeas relief as set forth in the conclusion below.

## III. LEGAL STANDARD

### A. Habeas Petitions

Federal courts have authority to grant writs of habeas corpus to individuals in custody if such custody is a "violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and... the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). To obtain habeas relief, habeas petitioners have the burden of demonstrating there is no lawful basis for their detention by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); 28 U.S.C. § 2241(c).

### B. Mandatory Detention Scheme

8 U.S.C. § 1225 applies to "applicants for admission" to the United States, defined as a noncitizen "present in the United States who has not been admitted or who arrives in the United States[.]" 8 U.S.C. § 1225(a)(1). Applicants for admission face mandatory detention and may only be released on parole "for urgent humanitarian reasons or significant public benefit," § 1182(d)(5)(A). *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).

This sole exception to mandatory detention, often referred to as humanitarian parole, may be granted "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). The implementing regulations include another requirement for humanitarian parole: the noncitizen must "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a noncitizen has been granted humanitarian parole, it means that a DHS official with authority[4] decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual, and that the individual did not pose a security or flight risk. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b).

Humanitarian parole may be terminated in two ways; each with their own procedural requirements. First, parole terminates automatically if the noncitizen departs from the United States or "at the expiration of the time for which parole was authorized." 8 C.F.R. § 212.5(e)(1). With automatic termination of parole, no written notice is required. *Id.* Second, if parole is not terminated automatically, either "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]"). In such instances, the noncitizen must be provided with written notice of the parole termination. 8 C.F.R. § 212.5(e)(2)(i).

[4] DHS officials authorized to make humanitarian parole decisions are "the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees." 8 C.F.R. § 212.5(a).

Whether automatic or pursuant to notice, once a noncitizen's parole has been terminated, implementing regulations require that "any order of exclusion, deportation, or removal previously entered *shall be executed*." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added); *see also* 8 C.F.R. § 212.5(e)(1). "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] *shall again be released* on parole unless in the opinion of [a DHS official with authority] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). Stated differently, unless detention is required for the timely removal of a noncitizen, continued detention following release on parole must be supported by individualized assessment by an authorized DHS official. *Id.* Otherwise, implementing regulations require that a noncitizen be returned to humanitarian parole. *Id.*

Taken together, the applicable regulatory scheme requires that, where parole has automatically terminated upon expiration and the noncitizen is not returned to custody for either the timely execution of a removal order or upon an individualized decision by an authorized DHS official, continuation of humanitarian parole may be implied and, thereafter, the procedures for on-notice termination apply. *See, e.g.*, *Dieng v. Hermosillo*, No. 2:26-CV-00190-LK, 2026 WL 411857, at *5–6 (W.D. Wash. Feb. 13, 2026).

**C. Due Process**

The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person "of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. Due process protections extend to all individuals within U.S. borders, including noncitizens, regardless of their immigration status. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Procedural due process demands meaningful notice and a genuine opportunity to be heard before the federal government infringes upon a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts in the Ninth Circuit apply the *Mathews* balancing test in immigration detention cases, weighing: (1) the private interest affected; (2) the risk of erroneous deprivation under existing procedures and the value of additional safeguards; and (3) the government's countervailing interest, including fiscal and administrative burdens. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022); *see also E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025) (collecting cases).

## IV. DISCUSSION

As a threshold matter, Respondents argue that, under their reading of the Supreme Court's decision in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), Petitioner may claim no procedural protections beyond those expressly provided by statute or regulation. Dkt. 7 at 8–9. Although Respondents acknowledge that due process generally requires notice and an opportunity to be heard, they contend the Court may not consider whether Petitioner was constitutionally entitled to such process in connection with his re-detention absent a statutory or regulatory source. *Id.*

Respondents' position and reading of *Thuraissigiam* has been firmly rejected by the Ninth Circuit. In *Padilla*, the Circuit Court emphasized "the application of the Fifth Amendment to noncitizens has been repeatedly and resoundingly reaffirmed over the many years," and "[t]here is just no room for doubt" that the same procedural due process protections apply to citizens and non-citizens alike who are physically present within the United States. *Padilla v. U.S. Immigr. & Customs Enf't*, No. 24-2801, 2026 WL 2822044, at *11 (9th Cir. Sept. 21, 2026).

The Court therefore rejects Respondents' contention that Petitioner falls beyond the purview of the Due Process Clause and turns to whether Petitioner's re-detention without prior notice and an opportunity to be heard comported with due process under the familiar three-part *Mathews* framework.

First, Petitioner's private interest is substantial. Petitioner was paroled into the United States and lived outside of immigration detention for three years before Respondents abruptly returned him to physical custody. His interest in maintaining that liberty, and avoiding renewed physical confinement, lies at the core of the liberty interests protected by the Due Process Clause. *See Zadvydas*, 533 U.S. at 690; *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025); *Torres v. Hermosillo*, 25-cv-02687-LK, 2026 WL 145715, at *5 (W.D. Wash. Jan. 20, 2026) (collecting cases recognizing liberty interests of those released on humanitarian parole). Thus, the first *Mathews* factor weighs heavily in Petitioner's favor.

Second, the procedures employed here created a substantial risk of erroneous deprivation, while additional process would have offered significant value. As outlined in Section III. B. above, several procedural protections apply to humanitarian parole decisions, and one or more were not followed in this case. *Torres*, 2026 WL 145715, at *7 ("[T]he risk of erroneous deprivation is significant where the government fails to follow its own procedures for revocation of parole, thus depriving the noncitizen of process due prior to revocation.") (collecting cases).

For example, unless automatically terminated by expiration of parole or the noncitizen's departure from the United States, a noncitizen is entitled to written notice that their humanitarian parole is being revoked. 8 C.F.R. § 212.5(e)(1). Respondents contend that Petitioner's parole expired and automatically terminated on June 23, 2025, and thus no written notice was owed to him. Dkt. 7 at 8–9. But immigration officials did not return Petitioner to custody when his parole

purportedly expired. Instead, Petitioner remained at liberty for more than twelve months before his re-detention on July 7, 2026. *See* Dkt. 9-2, 9-3. That substantial delay forecloses Respondents' contention that Petitioner's re-detention resulted from the automatic expiration of his parole for which no written notice is required. *See, e.g.*, *Dieng*, 2026 WL 411857, at *5–6.

Additionally, for noncitizens entitled to notice, termination of humanitarian parole requires the "accomplishment of the purpose for which parole was authorized" or for an authorized DHS official to decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i). Petitioner contends these procedures, too, were not followed. Dkt. 11 at 3. Notwithstanding the lack of specific argument by Respondents on this issue, the Court observes that the Parties submitted evidence suggesting that, at some unspecified point coinciding with Petitioner's re-detention, an unidentified immigration official determined Petitioner posed a risk of flight and was not eligible for bond. Dkt. 1-2 at 4; Dkt. 9-3 at 3. This evidence, however, does not demonstrate compliance with the procedures outlined in 8 C.F.R. § 212.5(e)(2)(i).

Moreover, while it is unclear from the instant record whether an authorized DHS official determined Petitioner's parole no longer served the public interest, it is clear the flight-risk determination purportedly made by an unspecified immigration official has never been tested through an adversarial proceeding in a neutral forum. *See Uisimbayev v. Scott*, No. 2:26-CV-03061-JHC, 2026 WL 2797987, at *5 (W.D. Wash. Sept. 18, 2026) (finding due procedural process violation where, in addition of failure to follow procedures outlined in § 212.5, the government failed to provide a custody hearing in a neutral forum). Indeed, Respondents' own records demonstrate that (1) Petitioner was advised of his ability to obtain custody review by an IJ and (2) he requested such review. Dkt. 9-5. Yet there is no evidence or allegation

demonstrating that review has been provided to Petitioner either prior to his re-detention or in the months that followed.

It is also important to note that, by nature of his initial release on humanitarian parole, Petitioner was found to not be a flight risk or danger to the community. Therefore, a custody hearing would have provided substantial value by permitting a neutral decisionmaker to test the factual and legal grounds asserted for depriving Petitioner of his liberty. *See Ramirez Tesara*, 800 F. Supp. 3d at 1137; *E.A. T.-B.*, 795 F. Supp. 3d at 1324. The second *Mathews* factor likewise weighs strongly in favor of Petitioner.

Third, the Court recognizes the Government's substantial interest in the efficient administration and enforcement of the immigration laws, including its lawful authority to detain noncitizens when appropriate. But Respondents identify no concrete administrative burden that would have resulted from providing Petitioner prior written notice, a parole termination decision by an authorized DHS official, or the opportunity to test the reasons for his re-detention in a neutral forum.

The last omission is particularly notable here because, again, immigration officials themselves notified Petitioner that he could seek post-deprivation review before an IJ, Petitioner requested that review, and Respondents nevertheless have not provided it. *See* Dkt. 9-5. As the Court has repeatedly recognized, custody hearings are routine proceedings, and the marginal administrative burden associated with providing such review is insufficient to outweigh the substantial liberty interest implicated by physical detention. *See E.A. T.-B.*, 795 F. Supp. 3d at 1324; *Ledesma Gonzalez v. Bostock*, No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *8 (W.D. Wash. Oct. 7, 2025). The third *Mathews* factor therefore also favors Petitioner.

On balance, the *Mathews* factors establish that the process afforded here was constitutionally inadequate. Accordingly, the Court concludes that Respondents re-detained Petitioner without providing the process due to him under the Fifth Amendment to the United States Constitution.

## V. REMEDY

Having determined that Petitioner was re-detained without the constitutionally required process, the Court now determines the appropriate remedy for his unlawful confinement. "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and... the traditional function of the writ is to secure release from illegal custody." *Preiser*, 411 U.S. at 484. "In modern habeas practice, courts often 'employ a conditional order of release,' which orders the government to release the petitioner unless it 'takes some remedial action' that corrects" the government's violation of the law. *Cardozo v. Bostock*, No. 2:25-CV-00871-TMC, 2025 WL 2592275, at *2 (W.D. Wash. Sept. 8, 2025) (quoting *Harvest v. Castro*, 531 F.3d 737, 741–42 (9th Cir. 2008)).

This Court and others in this District have ordered conditional release where, for example, the record showed that ICE officials performed some individualized assessment of flight risk, dangerousness, or noncompliance with release conditions before re-detaining a petitioner and that assessment provided the basis for the re-detention decision. *See, e.g., Caisa Telenchana v. Hermosillo*, No. 2:26-CV-00363-GJL, 2026 WL 696806, at *13 (W.D. Wash. Mar. 12, 2026); *Singh v. Noem*, No. 2:26-cv-00246-BAT, 2026 WL 592265, at *3 (W.D. Wash. Mar. 3, 2026); *Balwan v. Bondi*, No. 2:26-cv-00248-LK, 2026 WL 497098, at *5 (W.D. Wash. Feb. 23, 2026); *see also Musaev v. Hermosillo*, No. 2:26-CV-00522-RAJ, 2026 WL 925611, at *8 (W.D. Wash. Apr. 6, 2026) (ordering immediate release where, despite some individualized

review by immigration officials, there was no allegation or evidence showing the government's re-detention decision was premised on such review).

The record does not establish such circumstances here. Rather, DHS records submitted by the Parties indicate that immigration officials assessed Petitioner's flight risk at some point during his re-detention. *See* Dkt. 1-2 at 4; Dkt. 9-3 at 3. But this evidence does not establish, nor do Respondents contend, that immigration officials conducted an individualized assessment of Petitioner's circumstances *before* re-detaining him and that such assessment actually formed the basis for the re-detention decision. *See* Dkt. 7. Rather, as this Court recently found when faced with a similar record, "it is not clear that Respondents' reliance on Petitioner's failure to update his address was not an after-the-fact justification for a decision already made." *Mendez Rodriguez v. Hernandez*, No. 2:26-CV-02620-GJL, 2026 WL 2546112, at *5 (W.D. Wash. Aug. 28, 2026); *see also Kirykovich v. Hernandez,* No. 2:26-CV-00695-JNW, 2026 WL 890459, at *4 (W.D. Wash. Apr. 1, 2026) (declining to issue a conditional writ, because doing so "would reward the government for detaining first and asking questions later").

Immediate release rather than conditional release is further supported by Respondents' unexplained failure to provide Petitioner with the custody review they already advised him was available. Petitioner's Notice of Custody Determination advised him of his right to request review by an IJ, and Petitioner invoked that right. Dkt. 9-5. Respondents offer no explanation why the requested review has not been provided. Because Respondents have "already failed to provide the very process they themselves offered to Petitioner," the Court concludes that immediate release, rather than a conditional writ providing another opportunity to afford such process, is appropriate. *Romero Cantaderio v. Blanche*, No. 2:26-CV-02394-GJL, 2026 WL 2516756, at *5 (W.D. Wash. Aug. 26, 2026).

## VI. CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

(1) Petitioner's Petition (Dkt. 1) is **GRANTED**;

(2) Respondents **SHALL release** Petitioner Ronald Nakhil Torres-Fernandez from custody **within 24 HOURS** of this Order under conditions consistent with those in place at the time of his prior release, if any, unless Respondents choose to impose less restrictive conditions;

(3) Respondents **SHALL** file a certification within **48 HOURS** of the issuance of this Order, confirming that the Petitioner has been released from custody and providing the date and time of his release.

Finally, the Court will entertain any post-judgment motion for attorney's fees, as requested in the Petition. Any fee petition must be filed within the deadline set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 24th day of September, 2026.

Grady J. Leupold
United States Magistrate Judge